# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE STRAIGHT PATH | ) | |
| COMMUNICATIONS INC. | ) | C.A. No. 2017-0486-SG |
| CONSOLIDATED STOCKHOLDER | ) | |
| LITIGATION | ) | |

## MEMORANDUM OPINION

Date Submitted: November 9, 2021
Date Decided: February 17, 2022

Ned Weinberger and Mark Richardson, of LABATON SUCHAROW LLP, Wilmington, Delaware; OF COUNSEL: Jeroen van Kwawegen, Edward G. Timlin, and Alla Zayenchik, of BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Vincent R. Cappucci and Joshua K. Porter, of ENTWISTLE & CAPPUCCI LLP, New York, New York, *Attorneys for Plaintiffs JDS1, LLC and The Arbitrage Fund.*

Rudolf Koch, Kevin M. Gallagher, and Daniel E. Kaprow, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Thomas Uebler, of MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; OF COUNSEL: Jason Cyrulnik, Paul Fattaruso, and Evelyn Fruchter, of CYRULNIK FATTARUSO LLP, New York, New York, *Attorneys for Defendants IDT Corporation, Howard Jonas, and The Patrick Henry Trust.*

Kevin R. Shannon, Berton W. Ashman, Jr., Jacqueline A. Rogers, and David A. Seal, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Attorneys for Davidi Jonas.*

**GLASSCOCK, Vice Chancellor**

This action involves what at first blush appear to be derivative claims. Howard Jonas, the controller of Straight Path Communications Inc. ("Straight Path"), caused Straight Path to sell assets to a company, IDT Corporation ("IDT"), for an allegedly inadequate price. IDT was also controlled by the Jonas family. This sale gave rise to a chose-in-action for breach of fiduciary duty, a claim held by Straight Path. Shortly thereafter, Straight Path was sold to Verizon Communications, Inc. ("Verizon"), depriving the Plaintiffs here, former stockholders of Straight Path, of the opportunity to pursue the claim derivatively.

In fact, the matter is more complicated. One of the assets—an indemnification claim against IDT—was explicitly withheld by the Straight Path board of directors (the "Board") from the auction process ongoing at the time the claim was sold to IDT. In fact, the Board considered placing the claim asset, allegedly worth almost $1.2 billion,[1] in trust for the Straight Path stockholders, for them to enjoy as part of the results of the merger they anticipated. According to the Plaintiffs, Howard Jonas used his control to wrest the indemnification claim from Straight Path on IDT's behalf, seizing thereby what should have been part of the merger proceeds flowing to the Straight Path stockholders. In this, he was allegedly assisted by his son, Davidi Jonas, a Straight Path fiduciary. Accordingly, the Plaintiffs have filed direct claims

_____

[1] Pls.' Omnibus Answering Br. Opp'n to Defs.' Mots. Summ. J. 3, Dkt. No. 478 [hereinafter "Pls. MSJ AB"].

against both Jonases and IDT, as well as Howard Jonas's trust, which held his Straight Path stock (together, the "Defendants").

I denied motions to dismiss on this theory, and our Supreme Court affirmed on interlocutory appeal. The parties engaged in discovery thereafter, and the Defendants have moved for summary judgment via two separate motions. Because, based on the record as it now exists, I cannot find as a matter of law that judgment for the Defendants must be entered, those motions are denied. My reasoning follows.

Also argued with the motions for summary judgment was the Plaintiffs' motion for class certification, which the Defendants stoutly oppose. Obviously, the pertinence of that issue was dependent on the resolution of the instant motions for summary judgment. In light of my decision here, I now consider the motion for class certification submitted, and will address it promptly by a separate opinion without further argument or submission.

My reasons for denying the Defendants' motions for summary judgment are set out in full below.

# I. BACKGROUND

Before me at this time are two motions for summary judgment based on claims arising from the sale of Straight Path to Verizon in 2018.[2] The remaining claims in this action are direct claims alleging that merger consideration paid in connection with the 2018 acquisition of Straight Path was diverted from Straight Path stockholders.[3] The diversion claims do not arise directly from the Verizon acquisition (the "Merger"), but from the related sale of an indemnification claim (the "Indemnification Claim") and certain intellectual property assets (the "IP Assets") to IDT shortly before Straight Path's entry into a definitive merger agreement with Verizon. In short, Howard Jonas, the controlling stockholder of both Straight Path and IDT, refused to consent to the Merger before the sale of the Indemnification Claim and IP Assets. A special committee of Straight Path's Board thus consented to the sale of the Indemnification Claim and the IP Assets for what the Plaintiffs claim was unfair consideration. The Plaintiffs contend that this transaction, without which the Merger could not have occurred, diverted value from the stockholders to Howard Jonas, his trust vehicle, and IDT (together, the "IDT Defendants"). I considered the claims for breach of fiduciary duty[4] against the IDT Defendants and

---

[2] Also before me is the Plaintiffs' motion for class certification, which I will address in a separate memorandum opinion.

[3] *See generally In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 WL 3120804, at *20 (Del. Ch. June 25, 2018), *aff'd*, 206 A.3d 260 (Del. 2019) [hereinafter "*Straight Path I*"].

[4] The claim with respect to IDT is an aiding and abetting claim for breach of fiduciary duty. *See id.* at *20.

3

the conflicted Chief Executive Officer, President and Chairman of Straight Path to be reasonably conceivable upon a motion to dismiss and now address the various defendants' motions for summary judgment.

*A. Factual Overview*[5]

1. Parties, Relevant Non-Parties, and the Industry

The defendants in this action can be broadly grouped into two groups of movants: the IDT Defendants (composed of the separate defendants IDT, Howard Jonas, and The Patrick Henry Trust)[6] and Davidi Jonas.

IDT is a telecommunications company and the prior parent of non-party Straight Path.[7]  IDT spun off Straight Path on July 31, 2013 (the "Spin-Off"), at which time Straight Path became a publicly traded company.[8]

---

[5] The facts included in this section are strictly those necessary to resolution of the motions before me.  A more detailed recitation may be found in my prior opinion *Straight Path I. See id.*  Where additional facts are necessary, I draw them either from the evidence submitted under affidavit with the parties' papers, or from the prior decision in this case, affirmed by the Delaware Supreme Court.  *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1174 (Del. 1995) (holding that factual findings uncontested in appeal become law of the case).  Citations in the form of "Richardson Decl. —" refer to the Unsworn Decl. of Mark Richardson Supp. Pls. Omnibus Answering Br. Opp'n to Defs.' Mots. Summ. J., Dkt. No. 478.  Citations in the form of "Richardson Decl., Ex. —" refer to the exhibits attached to the Richardson Declaration, Dkt. Nos. 478–96.  Citations in the form of "Gallagher Decl. —" refer to the Transmittal Decl. of Kevin M. Gallagher, Esquire Pursuant to 10 *Del. C.* § 3927 Supp. Opening Br. Supp. IDT Defs.' Mot. Summ. J., Dkt. No. 442.  Citations in the form of "Gallagher Decl., Ex. —" refer to the exhibits attached to the Gallagher Declaration, Dkt. Nos. 442–46.
[6] *See* IDT Defs.' Mot. Summ. J., Dkt. No. 440 (specifying that the motion is brought by each of defendants IDT Corporation, The Patrick Henry Trust and Howard Jonas, while stylizing the motion as the "IDT Defendants' Motion").
[7] *See Straight Path I,* 2018 WL 3120804, at *2.  Straight Path was formerly a nominal defendant and is now a non-party following the mooting of Count IV in *Straight Path I.  See id.* at *20.
[8] *See id.*

Davidi Jonas has been the Chief Executive Officer ("CEO") and President of Straight Path since April 2013, and he became the Chairman in August 2013 as well.[9] As of 2013, Straight Path's business involved spectrum licenses (the "Spectrum Assets" or "spectrum licenses") in addition to certain other IP Assets.[10] The Spectrum Assets are regulated by the Federal Communications Commission (the "FCC").[11]

Howard Jonas is the founder and Chairman of IDT, and previously served as its CEO.[12] IDT's current CEO is Shmuel Jonas.[13] Shmuel and Davidi are Howard's sons.[14] At all relevant times, Howard was the controlling stockholder of both Straight Path and IDT, with control of over 70% of each company's voting stock.[15] Howard's Straight Path stock is owned via his trust, The Patrick Henry Trust, of which he is the beneficiary.[16] Despite this, Howard personally maintained certain consent rights with respect to Straight Path, such that his consent was necessary to any merger or sale of all assets by Straight Path.[17]

---

[9] *Id.*
[10] *Id.*
[11] *See id.* at *3.
[12] *Id.* at *2.
[13] *Id.*
[14] *Id.* This Memorandum Opinion refers to first names for the sake of clarity; no disrespect is intended.
[15] *Id.*
[16] *Id.*
[17] *Id.*

Howard and Davidi maintain a familial relationship, including facilitating trips for Davidi's children to visit Howard (their grandfather), living within walking distance of one another prior to 2015, and Howard calling Davidi (in addition to Davidi's siblings) to pray a religious blessing once weekly.[18]  Howard has also supported Davidi financially upon occasion, helping to pay his son's down payment for a home in 2015.[19]

Relatedly, Davidi and his siblings beneficially own over 10% of IDT's equity via a trust set up "for the benefit of the children of Howard S. Jonas."[20]

Non-party Jason Cyrulnik is an attorney who represented IDT for several years.[21]  During the time period that gave rise to the instant litigation, the question of whom (or which entity) Cyrulnik represented is occasionally subject to debate.[22] Cyrulnik considers himself to be friends with both Howard and Davidi Jonas.[23]

Non-party Verizon acquired Straight Path via the Merger in 2018.[24]

---

[18] Richardson Decl., Ex. 50, at 471–73.
[19] *Id.* at Ex. 66; *see also id.* at Ex. 67 (email gifting Davidi $700,000 "from [Howard's] accounts").
[20] *Straight Path I*, 2018 WL 3120804, at *2; *see also* Richardson Decl., Ex. 1, at 17.
[21] Compendium Dep. Trs. to Opening Br. Supp. Def. Davidi Jonas's Mot. Summ. J., Ex. 12, 20–23, Dkt. No. 452 [hereinafter "Dep. Comp."].
[22] *See* Reply Br. Further Supp. IDT Defs.' Mot. Summ. J. 21, Dkt. No. 509 (IDT Defendants arguing that Cyrulnik was acting as Straight Path counsel at specific meetings) [hereinafter "IDT MSJ RB"]; Pls. MSJ AB 48 (the Plaintiffs arguing that Cyrulnik was acting as IDT outside counsel at same meetings).
[23] Dep. Comp., Ex. 12, at 28–29 (with respect to Davidi); *id.* at 38 (with respect to Howard).
[24] *Straight Path I*, 2018 WL 3120804, at *8.

The Plaintiffs in this action, JDS1, LLC and The Arbitrage Fund, each held Straight Path Class B Common Stock as of the closing of the Merger.[25]

### 2. The IDT/Straight Path Spin-Off

IDT spun off Straight Path on July 31, 2013; prior to the Spin-Off, Straight Path had been IDT's subsidiary.[26] To effectuate the Spin-Off, IDT stockholders received Straight Path stock.[27] Part of the transaction documentation for the Spin-Off was the Separation and Distribution Agreement (the "S&DA") between IDT and Straight Path.[28]

### a. The Separation & Distribution Agreement

Among other things, the S&DA included indemnification provisions between the two parties.[29] At issue are the provisions requiring IDT to indemnify Straight Path. Per the S&DA, IDT is responsible for indemnifying Straight Path for "the failure of IDT or [its affiliates] to pay, perform or otherwise discharge, any of the IDT Liabilities."[30] The definition of "IDT Liabilities" expressly excludes liabilities

---

[25] Verified Consolidated Am. Class Action and Derivative Compl., ¶¶ 14–15, Dkt. No. 62 [hereinafter "Compl."]; *see also* IDT Defs. Opp'n Pls.' Mot. Class Certification 35, Dkt. No. 433.
[26] *Straight Path I*, 2018 WL 3120804, at *2.
[27] *Id.* at *3.
[28] *See generally* Gallagher Decl., Ex. 1 [such exhibit hereinafter "S&DA"].
[29] *Id.* §§ 6.01–.07.
[30] *Id.* § 6.02.

assigned to Straight Path under the agreement ("SPCI Liabilities").[31]  These non-indemnified SPCI Liabilities include:

> (ii) except as otherwise expressly provided in this Agreement or any Ancillary Agreement, any and all Liabilities of IDT, SPCI, or any of their respective Affiliates, primarily relating to, arising out of or resulting from the operation or conduct of the SPCI Business or any other business, or the ownership or use of the Assets of SPCI, as conducted at any time on or after the Effective Time (including any Liability relating to, arising out of or resulting from any act or failure to act by any director, officer, employee, agent or representative of IDT, SPCI, or any of their respective Affiliates (whether or not such act or failure to act is or was within such Person's authority), in each case arising before the Effective Date;
>
> . . .
>
> (iv) any and all Liabilities to the extent relating to, arising out of or resulting from any termination, sale, discontinuance or divesture of any entity, business, real property, or Asset formerly and primarily owned or managed by, or associated with SPCI or the SPCI Business, or arising out of such entity, business, real property, or Asset.[32]

For clarity, if a liability under the S&DA fits into the above-quoted subsections (ii) or (iv), it is a defined SPCI Liability, and IDT is not required to indemnify Straight Path for that liability under the express terms of the agreement.[33]

The term "SPCI Business" is defined to include "the ownership of the spectrum licenses and the leasing and marketing of fixed wireless spectrum," and

---

[31] *Id.* § 1.01.  The S&DA's definition of "Liabilities" also extends to the settlement with the FCC, as it expressly contemplates " . . . any law, rule, regulation, action, order or *consent decree* of any Governmental Entity . . . ."  *See id.* (emphasis added).

[32] *Id.*

[33] *See id.* § 6.02.

the definition of "Assets" lists among other things "properties, rights, [and] contracts."[34]

Also at issue here is a consent right in respect of third-party claims, which indicates that the indemnifying party will not "be liable for any settlement effected without its consent, which consent shall not be unreasonably withheld or delayed."[35] The pertinent indemnification provisions additionally lay out a detailed process for obtaining indemnification, including the indemnified party providing written notice to the indemnifying party of a third-party claim, express written acknowledgement of or objection to the claim by the indemnifying party, and specifics with regard to defense of any such third-party claim.[36]

Finally, the S&DA includes an anti-assignment provision preventing both of the parties from assigning their rights or delegating their duties under the S&DA without the other party's prior written consent.[37]

### 3. The Consent Decree and the Indemnification Claim

In 2016, the FCC investigated Straight Path and IDT for fraud associated with the renewal of spectrum licenses prior to the Spin-Off.[38] According to the Plaintiffs, Straight Path and IDT approached the investigation in a "coordinated" fashion.[39]

---

[34] *Id.* § 1.01.
[35] *Id.* § 6.07.
[36] *Id.*
[37] *Id.* § 11.05(b).
[38] *Straight Path I*, 2018 WL 3120804, at *3–4.
[39] *See* Pls. MSJ AB 48.

9

For his part, Davidi identified early on that the investigation might give rise to an indemnification obligation under the S&DA, and sent IDT an email asking to discuss the matter in February 2016.[40] Per the Plaintiffs, Straight Path and IDT worked together to respond to the FCC: certain individuals, including Cyrulnik (ostensibly IDT's outside counsel), were present at Straight Path Board meetings where settlement with the FCC was discussed, and Cyrulnik edited drafts of the "Consent Decree" memorializing the settlement with the FCC.[41] The IDT Defendants characterize the investigation differently, perceiving Cyrulnik to be acting in a capacity as Straight Path's counsel at those specified meetings and in editing the Consent Decree.[42]

Straight Path and the FCC entered into the Consent Decree in January 2017.[43] The Consent Decree was multi-pronged. First, Straight Path forfeited approximately 20% of its Spectrum Assets.[44] Second, Straight Path was required to sell its remaining Spectrum Assets within one year and to pay 20% of the sales proceeds to the FCC.[45] Finally, Straight Path consented to a $100 million fine.[46] The first

---

[40] Richardson Decl., Ex. 12.
[41] *See* Pls. MSJ AB 48. The Plaintiffs also argue that Howard was "personally involved" in discussions between Straight Path and IDT with respect to whether IDT would pay or guarantee any portion of a potential fine imposed by the FCC. *Id.*
[42] *See* IDT MSJ RB 21–22.
[43] *Straight Path I*, 2018 WL 3120804, at *4.
[44] *Id.*
[45] *Id.*
[46] *Id.*

$15 million was due over a nine-month period; the remaining $85 million would not become due in the event Straight Path sold the remainder of its Spectrum Assets to a third party and paid the agreed 20% penalty.[47]   The Consent Decree had the practical impact of forcing Straight Path to seek a sale of the company (the value of which was largely in the Spectrum Assets) or otherwise risk forfeiting all of its spectrum licenses due to its inability to pay the monetary fine.[48]

Notably, the Consent Decree sought to impose a 20% fine on the sale of Straight Path's *Spectrum Assets*—not upon the sale of Straight Path in total.[49]   To account for Straight Path's non-Spectrum Assets, the Consent Decree specified a dollar figure of $50 million in non-Spectrum Assets to be backed out of the proceeds from any sale of the company.[50]   The exact nature of the non-Spectrum Assets is not defined in the Consent Decree,[51] and the parties have introduced competing theories that the non-Spectrum Assets included either the IP Assets or certain tax benefits belonging to Straight Path.[52]

IDT was aware, and made statements in its public filings acknowledging, that it might face liability for the penalties under the Consent Decree due to the S&DA's

---

[47] *Id.*
[48] *Id.*
[49] Richardson Decl., Ex. 27, at D_00042028.
[50] *Id.* at Ex. 27, at D_00042031 (defining "Non-License Portfolio Assets" within the broader definition of "Proceeds").
[51] *See id.*
[52] *See infra* Section II.A.4.

indemnification provisions.[53] As noted in the prior opinion in this case, the basis for this acknowledgment was likely that the fraud took place in 2011 and 2012, before the Spin-Off.[54]

Following entry into the Consent Decree, the Straight Path Board formed a special committee (the "Special Committee") to evaluate options for the company going forward.[55] The Special Committee was composed of all Straight Path directors other than Davidi.[56] Although the Special Committee was formed for the purpose of divesting the company of its IP Assets, it eventually pivoted to discussing whether Straight Path might pursue the Indemnification Claim against IDT under the S&DA "in relation to the FCC consent decree and Straight Path's related liabilities."[57] At a February 14, 2017 meeting, the Special Committee resolved to preserve and pursue the Indemnification Claim for the benefit of Straight Path stockholders, notwithstanding any necessary sale of the company.[58] Thereafter they explored how the Indemnification Claim might affect the ongoing sale process and resolved to exclude the Indemnification Claim from any such sale.[59] The Special

---

[53] *Straight Path I*, 2018 WL 3120804, at *3–4.
[54] *Id.* at *4.
[55] *See id.*
[56] *Id.*
[57] *Id.* (internal quotations omitted).
[58] *Id.*
[59] *Id.* at *4–5.

Committee planned to establish a litigation trust to hold the Indemnification Claim apart from any sale of Straight Path.[60]

### a. Viability of the Indemnification Claim

As above, for IDT to be responsible for indemnifying Straight Path under the S&DA, the liability in question needs to be an "IDT Liabilit[y]."[61] The parties disagree as to whether the conduct that gave rise to the Consent Decree and the Indemnification Claim was in fact an IDT Liability. The IDT Defendants contend that the contract itself is unambiguous and should lead me to find that the fraudulent license renewal was, textually, an SPCI Liability.[62] If so, the Indemnification Claim was not viable.[63] Thus, no claim of breach of fiduciary duty against any of the IDT Defendants with respect to the Indemnification Claim could succeed.

### b. Implied Consent to Settlement

The S&DA also requires that any settlement of a third-party claim by the indemnified party, here ostensibly Straight Path, be approved via the consent of the indemnifying party (theoretically IDT).[64] The IDT Defendants contend that no such consent was granted.[65] However, the Plaintiffs suggest that a pattern of facts

---

[60] *Id.* at *5.
[61] *See supra* notes 30–33 and accompanying text.
[62] *See* Opening Br. Supp. IDT Defs.' Mot. Summ. J. 23–26, Dkt. No. 441 [hereinafter "IDT MSJ OB"].
[63] *Id.* at 30 (citing *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 477 (Del. Ch. 2013)).
[64] *See supra* note 35 and accompanying text.
[65] IDT MSJ OB 20–23.

regarding the Consent Decree gave rise to implied consent from IDT.[66] Most of these facts refer to the role Cyrulnik played in negotiating and discussing the Consent Decree, and whether he did so in his capacity as an attorney for IDT or for Straight Path.[67] Another fact that the Plaintiffs assert implies consent is Howard Jonas's discussion of the Consent Decree with Straight Path and Special Committee director William Weld.[68] Weld has testified in depositions that he and Howard met in January 2017 and, in the context of the Consent Decree negotiations, discussed the upcoming change from the Obama administration to the Trump administration.[69] Weld testified both that Howard was supportive of the consent decree,[70] but also that Howard "[m]aybe" thought that Straight Path should not enter into the Consent Decree.[71]

The Plaintiffs also claim that because other formalities required by the S&DA with regard to third-party claims were not followed, the "opportunity to consent" to the Consent Decree may not have been afforded to IDT.[72]

---

[66] Pls. MSJ AB 47–49.

[67] *See id.*; *see also supra* notes 41–42 and accompanying text.

[68] *See* Pls. MSJ AB 49.

[69] Gallagher Decl., Ex. 2, 184:2–20.

[70] *Id.* at Ex. 24, at 552:3–11 (testifying that Howard was supportive because the discussion centered on which administration might be preferable, rather than whether or not to enter into the Consent Decree).

[71] *Id.* at Ex. 2, at 180:20–181:24 (identifying Howard as the only person who "maybe" thought Straight Path should not enter the Consent Decree, but qualifying that Howard wasn't sure which administration to "make the deal" with).

[72] *See* Pls. MSJ AB 47.

### c. The Jonas-Jonas Tipping Allegations

The Plaintiffs' claim against Davidi is that he "tipped off" his father Howard as to the Special Committee's plan to (1) preserve the Indemnification Claim and (2) place the Indemnification Claim into the litigation trust.[73]

Again, the Special Committee was composed of all Straight Path directors other than Davidi.[74] When the Special Committee determined to preserve and later pursue the Indemnification Claim on February 14, 2017, Davidi was not in attendance.[75] On February 28, 2017, the Special Committee's attorneys at Shearman & Sterling LLP ("Shearman") communicated to Straight Path's counsel at Weil, Gotshal & Manges LLP ("Weil") that the Special Committee would seek to preserve the Indemnification Claim.[76] The Plaintiffs' theory is that Davidi became aware of this intention on February 28, as Weil represented Straight Path, and Davidi was the Straight Path CEO.[77]

At any rate, Straight Path sent out a second-round bid letter to buyers interested in purchasing the company on March 14, 2017, which indicated that the Indemnification Claim would not be sold as part of any sale of Straight Path.[78]

---

[73] *See* Compl. ¶¶ 7–9.
[74] *Straight Path I,* 2018 WL 3120804, at *4.
[75] *Id.* at *5 ("Davidi Jonas did not attend these Special Committee meetings . . . .").
[76] *Id.*
[77] Compl. ¶ 76.
[78] *Straight Path I,* 2018 WL 3120804, at *5.

Transmission of the bid letter was authorized by the full Board, meaning that Davidi certainly knew of the plan to preserve the Indemnification Claim by March 14.[79]

On March 14 and 15, nearly immediately after the transmission of the bid letter, Howard personally contacted each of the directors on the Special Committee and "threatened to blow up the sales process" if the Indemnification Claim was preserved.[80] As Howard (via his trust) was the controlling Straight Path stockholder, this threat had some potency.[81]

The Plaintiffs' allegations are that Davidi tipped off Howard as to the plan with respect to the Indemnification Claim, in part due to the speed with which Howard reacted after the bid letter was circulated.[82] The Plaintiffs' answering brief clarifies that they believe Davidi "encouraged and facilitated" his father, brother Shmuel, and Cyrulnik (in his capacity as IDT's counsel) in pressuring the Straight Path Special Committee to release the Indemnification Claim.[83] They also suggest that Davidi was not independent of Howard or IDT.[84]

---

[79] *Id.*
[80] *Id.* at *6.
[81] *See id.*
[82] *See, e.g.*, Compl. ¶ 79.
[83] Pls.' MSJ AB 67.
[84] *Id.* at 70–73.

In support of this theory is the fact that Davidi and his siblings own 10% of IDT.[85] Moreover, Davidi's brother Shmuel is the CEO of IDT, and his father Howard was the Chairman and controlling stockholder.[86] In sum, Straight Path's pursuit of the Indemnification Claim could have harmed Davidi personally, as well as his family, and Davidi was aware of this fact.[87]

While not part of the Special Committee, Davidi undertook certain actions while the Indemnification Claim negotiations were occurring, including: purportedly sending a memorandum to the Special Committee regarding their fiduciary duties;[88] speaking with his brother Shmuel about settling;[89] and texting with Cyrulnik on multiple occasions, including before and after the settlement occurred.[90] The texts with Cyrulnik also suggest a number of phone calls occurred between the two, though not necessarily during pertinent timeframes.[91]

---

[85] *See supra* note 20 and accompanying text. Davidi also owns shares in Straight Path. This fact is uncontested. *See, e.g.*, Opening Br. Supp. Def. Davidi Jonas's Mot. Summ. J. 25, Dkt. No. 439 [hereinafter "Jonas MSJ OB"]; *see also* Pls. MSJ AB 69.

[86] *Straight Path I*, 2018 WL 3120804, at *5.

[87] *Id.*

[88] Richardson Decl., Ex. 2, at 447:20–448:5.

[89] *Id.* at Ex. 51, at 202:6–203:21.

[90] *See, e.g.*, *id.* at Ex. 53, at STRP-DJONAS0000981 (before); *id.* at STRP-DJONAS0000995 (after).

[91] *See, e.g.*, *id.* at Ex. 53, at STRP-DJONAS0000977 ("Sorry I missed ur call"); *id.* at Ex. 53, at STRP-DJONAS0000975 ("Ya. I'll call you in a couple – getting off phone with Dave."); *id.* at Ex. 53, at STRP-DJONAS0000964 ("If not a good time, you can call me tomorrow."); *id.* at Ex. 53, at STRP-DJONAS0000963 ("Will call in 5 after maariv"); *id.* at Ex. 53, at STRP-DJONAS0000960 ("Hi Davidi – if you're up pls give me a call on my cel").

At the same time, discussions with various potential buyers regarding a sale of Straight Path were ongoing.[92]  Of note, the value of the Indemnification Claim was variable based on the sales negotiations.  The Consent Decree entitled the FCC to 20% of the sales proceeds of the remaining spectrum licenses.[93]  Thus, as the merger negotiations and price improved for Straight Path, the indemnification situation worsened for IDT.[94]

### 4. The Indemnification Claim Settlement and the Verizon-Straight Path Merger

On March 29, Howard and the Straight Path Special Committee met to discuss the Indemnification Claim and a sale of the IP Assets.[95]  At this meeting, certain defenses to the Indemnification Claim were posited, including failure by Straight Path to provide notice to IDT of the third-party claim and failure by Straight Path to obtain IDT's consent to settlement of the third-party claim.[96]

On April 6, Straight Path and IDT executed an initial term sheet (1) selling the IP Assets for $6 million and (2) settling the Indemnification Claim for $10 million plus a portion of the proceeds from certain uses of the IP Assets.[97]  The

---

[92] *Straight Path I*, 2018 WL 3120804,  at *7 ("[T]he bidding war for Straight Path was continuing unabated at this time.").

[93] *Id.* at *4.

[94] *Id.* at *7.

[95] *Id.* at *6.

[96] *See* Richardson Decl., Ex. 41, at 525:10–16 (Straight Path Special Committee counsel recalling factual assertions made by Cyrulnik at the March 29 meeting).

[97] Compl. ¶¶ 87–88.

term sheet was amended to become binding on April 9[98] and was disclosed to the public via a Form 8-K filed on April 10.[99]

Following the settlement of the Indemnification Claim, and following a bidding war between AT&T and Verizon, Verizon ultimately agreed to the Merger with Straight Path for $3.1 billion.[100] In purchasing Straight Path, Verizon also by extension purchased all of Straight Path's assets, including the remaining spectrum licenses subject to the Consent Decree. As such, $614 million of the Merger consideration was paid to the FCC in accordance with the Consent Decree.[101]

### B. Procedural History

The Plaintiffs served the operative amended complaint (the "Complaint") containing four counts on August 29, 2017.[102] One of these counts, Count IV, has been mooted following the closing of the Merger.[103] Remaining are the following direct claims: Count I, for breach of fiduciary duty against defendants Howard Jonas and The Patrick Henry Trust in their capacities as controlling stockholder; Count II, for breach of fiduciary duty against defendant Davidi Jonas in his capacity as a

---

[98] *Id.* ¶ 87.
[99] *See* Transmittal Decl. of Daniel E. Kaprow, Esquire Pursuant to 10 *Del. C.* § 3927 Supp. IDT Defs.' Opp'n to Pls.' Mot. Class Certification, Ex. 2, Dkt. No. 434.
[100] *Straight Path I*, 2018 WL 3120804, at *7.
[101] *Id.* at *8.
[102] *See* Compl.
[103] *See Straight Path I*, 2018 WL 3120804, at *8.

director and executive officer; and Count III against IDT for aiding and abetting the breaches of fiduciary duty pled in Counts I and II.[104]

The Defendants moved to dismiss, and I denied the motions to dismiss with respect to Counts I through III in my prior opinion on June 25, 2018.[105] The IDT Defendants sought an interlocutory appeal, which I certified on July 26, 2018.[106] The Delaware Supreme Court affirmed on February 22, 2019.[107] Discovery followed.[108]

Each of the IDT Defendants and Davidi Jonas moved for summary judgment on July 6, 2021.[109] Following briefing, I held oral argument with respect to the IDT Defendants' motion for summary judgment (the "IDT Summary Judgment Motion"), Davidi Jonas's motion for summary judgment (the "Jonas Summary Judgment Motion"), and the motion for class certification on November 9, 2021.[110]

---

[104] Compl. ¶¶ 120–33.
[105] *Straight Path I*, 2018 WL 3120804. I granted the motion to dismiss with respect to Count IV. *See id.* at *20.
[106] *See* Letter Op. and Order, Dkt. No. 124.
[107] *See IDT Corp. v. JDS1, LLC*, 206 A.3d 260 (Del. 2019).
[108] Certain motion practice, including motions to compel, occurred as part of the discovery process. I issued a Letter Opinion addressing a motion to compel on June 15, 2020. *See* Letter Op., Dkt. No. 284. I appointed a Special Discovery Master in April 2020. *See* Granted ([Proposed] Order Appointing Special Master), Dkt. No. 276.
[109] *See* Def. Davidi Jonas's Mot. Summ. J., Dkt. No. 439; IDT Defs.' Mot. Summ. J., Dkt. No. 440.
[110] *See* Tr. of 11.9.21 Oral Arg. re Mot. for Class Certification, Class Representatives, and Mots. Summ. J., Dkt. No. 531 [hereinafter "Oral Arg."].

## II. ANALYSIS

A movant may obtain summary judgment if there are no genuine issues of material fact, and if the movant is therefore entitled to judgment as a matter of law.[111] In considering a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party (in both instances here, the Plaintiffs).[112] "There is no 'right' to summary judgment."[113] When a court finds it appropriate to consider the matter on a trial record, summary judgment may be denied.[114]

A plaintiff must present "some evidence, either direct or circumstantial," to support all the elements of its claim in order for said claim to survive a defendant's motion for summary judgment.[115] Summary judgment is appropriately entered against a plaintiff who fails to make a sufficient showing establishing the existence of an element essential to its case.[116] However, the court appropriately denies summary judgment where "the record indicates a material fact is in dispute or if it

---

[111] *See Mason v. Network of Wilmington, Inc.*, 2005 WL 1653954, at *2 (Del. Ch. July 1, 2005).
[112] *Id.*
[113] *In re Tesla Motors, Inc. S'holder Litig.*, 2020 WL 553902, at *3 (Del. Ch. Feb. 4, 2020) (citation omitted).
[114] *See Ebersole v. Lowengrub*, 180 A.2d 467, 468–69 (Del. 1962) (citing *Knapp v. Kinsey*, 249 F.2d 797 (6th Cir. 1957)).
[115] *Mason*, 2005 WL 1653954, at *2 (internal quotations omitted) (citation omitted).
[116] *Id.*

21

seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances."[117]

These standards guide my consideration of each of the IDT Summary Judgment Motion and the Jonas Summary Judgment Motion.

*A. The IDT Summary Judgment Motion*

The IDT Summary Judgment Motion is largely predicated on the assertion that there was no viable right to indemnification held by Straight Path in the wake of the FCC settlement. If the Indemnification Claim was illusory, according to this theory, there can have been no diversion of consideration. This assertion is purportedly borne out of the text of the S&DA. In construing contractual language, Delaware courts look to effectuate the parties' intent "based on the parties' words and the plain meaning of those words."[118] Summary judgment is an appropriate stage for the enforcement of unambiguous contracts because there is no material dispute of fact for the courts to resolve.[119] Whether or not a contract is ambiguous is a question of law for the court.[120] A contract is not rendered ambiguous on the sole basis that the parties to a litigation disagree regarding the meaning of a contractual term.[121] A finding of ambiguity is appropriate when the provision at

---

[117] *See Tesla Motors*, 2020 WL 553902, at *3 (quoting *Guy v. Judicial Nominating Comm'n*, 659 A.2d 777, 780 (Del. Super. Ct. 1995)).

[118] *See Zimmerman v. Crothall*, 62 A.3d 676, 690 (Del. Ch. 2013) (citation omitted).

[119] *See Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1030 (Del. Ch. 2008).

[120] *Id.*

[121] *Id.*

issue is "reasonable or fairly susceptible of different interpretations or may have two or more different meanings."[122] For the IDT Defendants to prevail on their theory, the S&DA must be unambiguous such that I can determine the parties' intent based on the language of the contract alone.[123]

The IDT Defendants propose three separate contractual bases for the invalidity of the Indemnification Claim, each of which is addressed in turn below. Again, if the Indemnification Claim was not viable, then its sale for $10 million to IDT would not constitute an improper diversion of Merger consideration, and the Plaintiffs' direct claims with respect to the Indemnification Claim must fail.

This section also addresses the valuation of the IP Assets, which is contested among the parties.

### 1. SPCI Liabilities Under the S&DA

To assess the IDT Summary Judgment Motion here requires an explication of Straight Path's indemnification right under the S&DA. That right is laid out at Section 6.02, under which IDT is required to indemnify Straight Path for "the failure of IDT [or its affiliates] to . . . discharge [] any of the IDT Liabilities."[124] Those liabilities, in turn, are defined in part as "(ii) any Liabilities of [Straight Path] . . .

[122] *Id.* (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).
[123] *See id.* ("Therefore, the court's analysis is initially focused 'solely on the language of the contract itself.'").
[124] S&DA § 6.02.

arising, or related to the period, prior to the Effective Time."[125]  This would include the pre-Spin-Off fraud in way of the renewal of the spectrum licenses at issue here. The IDT Liabilities, and IDT's indemnification obligation therefor, are subject to a carve-out, however: excluded are those liabilities "designated as SPCI Liabilities" under the S&DA.[126]  In other words, IDT is liable[127] for indemnification for liability arising from the license-renewal fraud unless the parties designated that liability as an "SPCI Liabilit[y]" exempt from the indemnification right running to Straight Path.[128]

The IDT Defendants, accordingly, seek to cast the problematic conduct—the fraudulent renewal of spectrum licenses—as an SPCI Liability by definition.[129]  In doing so, they point to subsections (ii) and (iv) in the multi-part SPCI Liabilities definitional language.[130]

I consider first subsection (iv), which provides that SPCI Liabilities include, among others:

> (iv) any and all Liabilities to the extent relating to, arising out of or resulting from any termination, sale, discontinuance or divesture of any entity, business, real property, or Asset formerly and primarily owned or managed by, or associated with SPCI or the SPCI Business, or arising out of such entity, business, real property, or Asset.[131]

---

[125] *Id.* § 1.01.
[126] *Id.*
[127] Absent applicable defenses addressed below.
[128] *See supra* note 33 and accompanying text.
[129] *See generally* IDT MSJ OB; IDT MSJ RB.
[130] *Id.*
[131] S&DA § 1.01.

The subsection refers to those liabilities relating to, arising out of or resulting from, pertinently, a sale. As outlined in the facts above, the spectrum licenses properly fall under the definition of an Asset associated with the SPCI Business.[132] The IDT Defendants' position is that the Indemnification Claim unambiguously "aris[es] out of" these spectrum licenses, and their sale to Verizon in the Merger.[133]

I agree that the quoted language is unambiguous, but it is apparent that the liability in question—the fine and 20% penalty owed to the FCC as a result of the Consent Decree, which stemmed from the improper obtaining of spectrum license renewals—does *not* arise out of, result from, or relate to the sale or termination of those licenses, although the amount of the liability is derivative of the sales price, in part. Instead, the liability arises from the fraud that occurred when the spectrum licenses were renewed. This subsection thus does not preclude the Indemnification Claim's viability, as a matter of law.

I next turn to section (ii), which uses time-based limitations to determine whether certain liabilities constitute SPCI Liabilities (and are therefore exempt from IDT's general indemnification obligation). Section (ii) defines non-indemnified SPCI Liabilities as follows:

> except as otherwise expressly provided in this Agreement or any
> Ancillary Agreement, any and all Liabilities of IDT, SPCI, or any of
> their respective Affiliates, primarily relating to, arising out of or

---

[132] *See supra* note 34 and accompanying text.
[133] *See supra* notes 61–63 and accompanying text.

resulting from the operation or conduct of the SPCI Business or any other business, or the ownership or use of the Assets of SPCI, as conducted at any time on or after the Effective Time (including any Liability relating to, arising out of or resulting from any act or failure to act by any director, officer, employee, agent or representative of IDT, SPCI, or any of their respective Affiliates (whether or not such act or failure to act is or was within such Person's authority), in each case arising before the Effective Date;[134]

It is such drafting as this that keeps lawyers fully employed, and jurists off the streets. Unsurprisingly, the parties construe the above text differently. The IDT Defendants believe it is clear that the language excludes from indemnification liabilities that arose from the operation or conduct of the SPCI Business *before* the Effective Date.[135] They point to the ultimate clause of subsection (ii). (I note the term "Effective Date" is not defined as part of the S&DA[136] and assume without deciding that "before the Effective Date" is equivalent to "pre-Spin-Off".) Accordingly, they read the definition of non-indemnified SPCI Liabilities to include any act by an IDT officer primarily relating to, arising out of or resulting from the SPCI Business (including the ownership of the spectrum licenses) *before the Spin-Off*. Thus, any improper action taken in renewing the spectrum licenses would be an *SPCI Liability*, and IDT would have no indemnification obligation to Straight Path.[137]

---

[134] S&DA § 1.01.

[135] *See* IDT MSJ OB 23–24.

[136] *See* S&DA § 1.01.

[137] If IDT meant through this language to disclaim liability for its own pre-Spin-Off behavior, it is difficult to perceive what it *was* agreeing to indemnify, I note.

26

For their part, the Plaintiffs believe it is clear that the language excludes from indemnification liabilities that arose from the operation or conduct of the SPCI Business *at a time on or after* the Effective Time.[138] In other words, acts by an IDT officer primarily relating to, arising out of or resulting from the SPCI Business *as conducted at any time on or after the Effective Time* (*i.e.*, on or after the time of the Spin-Off) would be an SPCI Liability, and IDT would have no indemnification obligation. Conversely, actions taken by IDT employees *prior* to the Spin-Off to improperly renew the spectrum licenses would fall outside the definition of an SPCI Liability, and therefore IDT would be *prima facie* responsible for paying the Indemnification Claim.

The language at issue is ambiguous, indeed obscure. It contains an obvious blunder, as a parenthetical fails to close. Moreover, as noted, it uses a capitalized term, Effective Date, that is not defined in the agreement. Assuming the missing parenthesis is interior, and removing the parenthetical language for clarity, the provision defines exempt SPCI Liabilities in pertinent part as "Liabilities of IDT [or Straight Path] . . . resulting from the . . . [Straight Path] business . . . as conducted . . . *on or after the Effective Time* . . ., *in each case arising before the Effective Date*."[139] Given the turbidity of this prose, I cannot find that either party's

---

[138] *See* Pls. MSJ AB 52–53.
[139] S&DA § 1.01.

interpretation is unsupportable as a matter of law, and I cannot determine the parties' intent from the words of the contract alone.

Because the S&DA is ambiguous, there is a genuine issue of material fact as to the parties' intentions in drafting this subsection of the SPCI Liabilities definition, and as to whether they meant to exclude the liability at issue from the indemnification obligation. Summary judgment is, accordingly, unavailable on this ground.

## 2. Lack of Consent to Settlement

The IDT Defendants also seek summary judgment on the basis that IDT cannot be responsible for indemnifying a claim in the event of a "settlement effected without its consent."[140]

Section 6.07 of the S&DA discusses the procedures for notice and defense of third-party claims, such as the FCC's Consent Decree.[141] It lays out a process whereby the indemnified party (here purportedly Straight Path) was required to give the indemnifying party (allegedly IDT) written notice "[p]romptly" following the "receipt of notice of the commencement by a third party of any Action" or the "receipt of information from a third party alleging the existence of a claim" against

---

[140] *Id.* § 6.07.
[141] *Id.*

28

the indemnified party.[142]  Upon receipt of the notice, the indemnifying party was to either acknowledge or object to the indemnification obligation via written notice.[143]  In certain instances, the indemnifying party could enter into a settlement or compromise of the third-party claim *without* the indemnified party's "prior written consent."[144]  However, the provision specifically states that the indemnifying party "shall not be liable for any settlement effected without its consent, which consent shall not be unreasonably withheld or delayed."[145]

The parties dispute whether consent was given by IDT before Straight Path's entry into the Consent Decree.  The IDT Defendants state that Straight Path "never sought, let alone secured, IDT's consent" to the Consent Decree.[146]  The Plaintiffs do not suggest that IDT provided prior written consent, but suggest that IDT gave its consent by implication, listing a number of facts regarding the negotiations between Straight Path and the FCC and the ways that various IDT personnel were involved.[147]

---

[142] *See id.*  Whether or not notice was in fact given is a disputed issue but is not dispositive to my treatment of § 6.07, which includes a curative provision in the event the failure to give notice was not materially prejudicial.  *Id.*  I do not make any finding with respect to that question here.
[143] *Id.*
[144] *Id.*
[145] *Id.*
[146] IDT MSJ OB 20.
[147] Pls. MSJ AB 47–49.  The Plaintiffs also argue that the consent right may not have been available to IDT, as IDT never formally acknowledged or objected to the third-party claim under S&DA § 6.07.  *See id.* at 47.  I do not consider this argument further here as it is not dispositive to my treatment of the consent right.

The question of whether implied consent was given is necessarily an issue of material fact best considered upon live testimony. The Plaintiffs' theory may prove difficult to vindicate on the facts alleged. However, I cannot find as a matter of law that consent was not given under the S&DA—particularly in light of the fact that this particular language of Section 6.07 calls for mere *consent*, rather than *prior written consent*, as in the remainder of the section.[148]

### 3. The Question of Assignability

Finally, the IDT Defendants point to Section 11.05(b) of the S&DA, which contains a non-assignability clause preventing either party from assigning its rights under the agreement without the prior written consent of the other party.[149] They posit that this provision entirely precludes the viability of the Indemnification Claim, because any attempted assignment of the claim by Straight Path would have failed under the express terms of the agreement.[150] Given that Straight Path was simultaneously exploring a sale, the assignability of the claim was particularly important.

The Special Committee had seemingly identified this as an issue, however, and was planning to address the question by placing the Indemnification Claim in a

---

[148] *See* S&DA § 6.07.
[149] *Id.* § 11.05(b).
[150] *See* IDT MSJ OB 32–33.

litigation trust.[151]  The IDT Defendants maintain that no such structure was possible, because the Indemnification Claim could not be assigned.[152]  However, the Plaintiffs point me to the deposition of the Special Committee's counsel at Shearman, Jerome Fortinsky, who testified that he believed a trust structure that had been drawn up would have avoided the assignment issue.[153]

Again, there is a genuine issue of material fact in dispute: whether a litigation trust structure could have been devised to preserve the Indemnification Claim without running afoul of the non-assignability provision.  This is mixed question of fact and law best answered on a full record.  In any event, even if no such structure could have been designed, other avenues may have existed to maintain the viability of the claim: for example, obtaining consent to assignment or consent to a merger.  Construing the facts in the light most favorable to the non-moving party, the existence of this contractual language, without more, does not render recovery under the Indemnification Claim impossible as a matter of law.  Thus, summary judgment fails with respect to the non-assignability claim as well.

### 4. The IP Assets

Separately from the viability of the Indemnification Claim, the IDT Defendants move for summary judgment with respect to the value of the IP Assets,

---

[151] Pls. MSJ AB 22.
[152] *See* IDT MSJ OB 32–33.
[153] *See* Pls. MSJ AB 61 n.168; *see also* Richardson Decl., Ex. 40 (one such draft structure).

which were sold to IDT for $6 million at the same time as the Indemnification Claim.[154] The Plaintiffs' Complaint asserts that the IP Assets were in fact worth $50 million, and their sale for $6 million constituted a sale for "no more than 12% of their value."[155]

The Plaintiffs' theory is that the IP Assets constitute "the vast majority" of Straight Path's "Non-License Portfolio Assets," as described in the Consent Decree.[156] The Non-License Portfolio Assets were carved out from the greater Straight Path entity so that the FCC's 20% penalty would only be imposed on the sale of Spectrum Assets, rather than the sale of the entire company.[157] As such, the Consent Decree defines Non-License Portfolio Assets as "assets of Straight Path other than the License Portfolio[158] that are [to] be included in the [sale] transaction . . . *provided that*, notwithstanding the actual value of such Non-License Portfolio Assets, the value attributed to the Non-License Portfolio Assets for the purpose of this provision shall be $50,000,000."[159] Accordingly, the Plaintiffs theorize that the value of the IP Assets is, essentially, $50 million.

---

[154] *See supra* note 97 and accompanying text.
[155] *See* Compl. ¶ 90.
[156] *Id.*; *see also* Richardson Decl., Ex. 27, at D_00042031.
[157] *See supra* note 49 and accompanying text.
[158] Defined as the "radio licenses" specified in an appendix to the Consent Decree. Richardson Decl., Ex. 27, at D_00042030.
[159] *Id.* at Ex. 27, at D_00042031 (emphasis in original).

32

The IDT Defendants have provided evidence rebutting this theory. In particular, they have provided an email from Morgan Lewis & Bockius LLP, which represented Straight Path in connection with the Consent Decree negotiation.[160] That email suggests a definition for the term "Proceeds" as the "entire monetary value received from one or more transactions that [sells or assigns the License Portfolio]," excluding "$50 million attributable to Straight Path's *tax loss assets* in the event that those assets are included in the transaction pursuant to which the transfer of control or assignment of the License Portfolio is implemented."[161] The IDT Defendants also proffer a "Special Board Meeting" presentation from Evercore dated February 6, 2017, which indicates that the "[v]aluation of patent portfolio was $6.4M[illion]" as of October 2016.[162]

The IP Assets issue is problematic. The Indemnification Claim, in my view, was sufficiently intertwined with the Merger and its attendant consideration, and sufficiently material to that transaction, so as to constitute a direct claim, rather than simply a separate transaction for inadequate consideration (which would have been a classic derivative claim extinguished by the Merger).[163] How the IP Assets, purchased by Howard at the same time, fit into this paradigm is unclear. Since the

---

[160] *See* Gallagher Decl., Ex. 10, at MLB_0000358; *see also Straight Path I*, 2018 WL 3120804, at *3.
[161] Gallagher Decl., Ex. 10, at MLB_0000358 (emphasis added).
[162] *See id.* at Ex. 12, at EVERCORE_00007863.
[163] *See generally Straight Path I*, 2018 WL 3120804.

33

direct claim survives, however, there is little utility addressing the IP Assets claim separately without a full record, and I decline to enter summary judgment here.

* * *

*B. The Jonas Summary Judgment Motion*

In short, the claims against Davidi Jonas are for breach of fiduciary duty[164] based on his competing personal financial and familial interests in both IDT and Straight Path. The evidence of Davidi's fiduciary breach appears to be weak stuff. Despite a thin record, however, most of these arguments are based upon ambiguous facts that require a credibility assessment at trial. I find, based upon the record and the Plaintiff-friendly inferences therefrom, that material issues of fact remain as to whether Davidi was an independent fiduciary, and, if not, whether he acted based on that lack of independence.

The Plaintiffs originally claimed that Davidi "tipped off" Howard, his father, with respect to the Special Committee's determination to place the Indemnification Claim into a litigation trust.[165] This claim is styled as a breach of fiduciary duty

---

[164] The Plaintiffs' answering brief specifies that they bring both a duty of loyalty claim in Davidi's capacity as a director under *Cornerstone* as well as a nonexculpated duty of care claim in Davidi's capacity as an officer. *See* Pls. MSJ AB at 73 n.198. Davidi's reply brief responds that the Plaintiffs have failed to allege the nonexculpated duty of care claim, and have not provided any factual or legal support for the same. *See* Reply Br. Supp. Def. Davidi Jonas's Mot. Summ. J. 27, 28, Dkt. No. 508 [hereinafter "Jonas MSJ RB"]. The Plaintiffs also failed to argue any facts with respect to the duty of care claim at oral argument. *See generally* Oral Arg. This claim is therefore waived. *See Emerald Partners v. Berlin,* 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[165] *See* Compl. ¶ 79.

34

wherein Davidi acted "to advance his and his family's interests above those of" Straight Path and its stockholders.[166] It survived the motion to dismiss stage because I found it reasonable to infer that Davidi could have made such a tip based on his competing family interests.[167]

Following discovery, the Plaintiffs appear to have pivoted to three new factual grounds for finding that Davidi breached his fiduciary duties: (1) that Davidi failed to disclose certain information to the Special Committee regarding notice of the Indemnification Claim;[168] (2) that Davidi "enlisted" Cyrulnik to pressure the Straight Path Special Committee into accepting the $10 million settlement offered by IDT;[169] and (3) that Davidi worked with Howard and Shmuel to undermine the negotiations regarding the Indemnification Claim.[170]

Davidi is quite correct to point out that more than mere allegations or denials are required in order to create a genuine issue of material fact.[171] To survive on a motion for summary judgment, a plaintiff must provide the Court with "solid evidence" of such genuine issue.[172] However, the evidence is still viewed in the light

[166] *Id.* ¶ 127.
[167] *See Straight Path I*, 2018 WL 3120804, at *18.
[168] *See* Jonas MSJ OB 33.
[169] *See id.* at 40.
[170] *See id.* at 38.
[171] *See, e.g., Winshall v. Viacom Int'l Inc.*, 2012 WL 6200271, at *4 (Del. Ch. Dec. 12, 2012), *aff'd*, 76 A.3d 808 (Del. 2013).
[172] *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 349 (Del. Ch. 2008).

most favorable to the non-movant.[173]  If conflicting evidence is put forth such that a genuine issue of material fact remains, summary judgment should be denied and the issue should be considered at trial.[174]

*Cornerstone* specifies three ways in which a non-exculpated claim for breach of fiduciary duty may be stated against a fiduciary: (1) the fiduciary may harbor a self-interest adverse to the stockholders' interests; (2) the fiduciary may act "to advance the self-interest of an interested party from whom they could not be presumed to act independently"; or (3) the fiduciary may act in bad faith.[175]  The Plaintiffs' theory of their claim falls under prongs (1) and (2)—that is, they do not allege bad faith, but they allege Davidi was self-interested, lacked independence, and acted to advance the self-interest of an interested party—his family members.[176]

There is only a weak case for Davidi's self-interest.  Caselaw addressing this *Cornerstone* prong most commonly limits itself to discussing financial self-interest.[177]  By virtue of his financial holdings in IDT, there is evidence supporting

---

[173] *Id.* at 356.
[174] *See id.*; *see also In re BGC Partners, Inc. Derivative Litig.*, 2021 WL 4271788, at *11 (Del. Ch. Sept. 20, 2021) ("If there is evidence from which a rational fact finder could conclude that a [defendant] breached their duty of loyalty, the matter must be resolved at trial.").
[175] *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1180–81; *see, e.g.*, *BGC Partners*, 2021 WL 4271788, at *9 (discussing the three *Cornerstone* methods of establishing a non-exculpated fiduciary duty claim in the context of a summary judgment motion).
[176] *See* Pls. MSJ AB 68.
[177] *See, e.g., In re Pattern Energy Grp. Inc. S'holders Litig.*, 2021 WL 1812674, at *66 (Del. Ch. May 6, 2021) (citing *The Frederick Hsu Living Trust v. ODN Holding Corp.*, 2017 WL 1437308, at *26 (Del. Ch. Apr. 14, 2017)) ("To plead interestedness, a plaintiff can plead the fiduciary received 'a personal financial benefit from a transaction that is not equally shared by the stockholders,' or 'was a dual fiduciary and owed a competing duty of loyalty to [another entity] . . .

the claim that Davidi had a self-interest that could be found adverse to the Straight Path stockholders' interests, and the claim transcends mere speculation or allegations.[178]  I do acknowledge that caselaw exists suggesting that Davidi's financial interest in IDT is too minor to be deemed a material, disabling conflict.[179]  Given the nature of Davidi's IDT holdings in a trust vehicle, and the fact that the trust is not solely for Davidi's benefit but also benefits other family members, I would likely need further evidence before addressing whether *solely* pecuniary self-interest could give rise to a breach of the fiduciary duty of loyalty.

But there is another avenue for establishing a breach of the fiduciary duty of loyalty under *Cornerstone* which lends itself more closely to the instant facts: the

---

or received a unique benefit not shared with the stockholders.'"); *but see In re AmTrust Fin. Servs. S'holder Litig.*, 2020 WL 914563, at *13 (Del. Ch. Feb. 26, 2020) (self-interest in eliminating claims against a director); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *8 (Del. Ch. July 24, 2009) (directors self-interested in a transaction that benefitted preferred stockholders where each director had an employment or ownership relationship with an entity that owned said preferred stock).  An argument could perhaps be made that Davidi had a self-interest in preserving his relationship with his family.  *Cf., e.g., ATR-Kim Eng Fin. Corp. v. Araneta*, 2006 WL 3783520, at *16 (Del. Ch. Dec. 21, 2006) (suggesting that transferring an operating company to family members for no value constituted a self-interested transaction).  That theory seems to necessarily imply questions of independence, and at any rate has not been aggressively briefed in this precise context.  To the extent there is overlap between the *Cornerstone* category of self-interest and the broader concept of independence, I have endeavored to avoid that overlap by addressing Davidi's financial interests alone here and considering the independence analysis separately under prong (2).

[178] *See, e.g.*, Richardson Decl., Ex. 1, at 16, 17 (identifying Davidi Jonas among the beneficiaries of "[c]ertain trusts for the benefit of the children of Howard S. Jonas," a Jonas family party "[i]nvested in IDT").

[179] *See* Jonas MSJ RB 6; *see also, e.g.*, *In re OPENLANE, Inc. S'holders Litig.*, 2011 WL 4599662, at *5 (Del. Ch. Sept. 30, 2011).

argument that Davidi "acted to advance the self-interest of an interested party from whom [he] could not be presumed to act independently."[180]

This Court has previously acknowledged that this prong of the *Cornerstone* test reviews both independence and process.[181] "[I]f the director is *either* (1) shown to be independent *or* (2) shown not to have actively furthered the conflicted party's interests," this theory of liability will fail.[182]

The independence analysis is straightforward. "[O]ur law is not blind to the practical realities of serving as a director of a corporation with a controlling stockholder."[183] "To plead a lack of independence, a plaintiff can plead the fiduciary is 'sufficiently loyal to, beholden to, or otherwise influenced by an interested party' to undermine the fiduciary's ability to judge the matter on its merits."[184]

Howard and Davidi enjoy the relationship between a father and a son, and formerly the relationship between a controlling stockholder (via a blind trust and certain consent rights)[185] and a Chairman/CEO.[186] Davidi testified at his deposition to a handful of facts describing their father/son relationship, including: weekly phone calls from Howard to his children, including Davidi, to deliver a religious blessing

---

[180] *Cornerstone*, 115 A.3d at 1180.
[181] *BGC Partners*, 2021 WL 4271788, at *10 (emphasis in original).
[182] *Id.*
[183] *Id.* at *6 (citing *In re BGC Partners, Inc.*, 2019 WL 4745121, at *7 (Del. Ch. Sept. 30, 2019)).
[184] *In re Pattern Energy*, 2021 WL 1812674, at *68 (citations omitted).
[185] *See* Richardson Decl., Ex. 50, at 617:21–23 (Davidi testifying that Howard placed his shares in a blind trust to preserve Davidi's independence).
[186] *See supra* note 9 and accompanying text.

38

(although characterized as a one-way conversation); weekly visits from Davidi's children to their grandparents for a number of years; and the fact that Davidi and Howard used to live within walking distance of each other.[187] Howard has also financially assisted Davidi and his wife as recently as 2015, including by paying the "balance" of their down payment on a house.[188] At the minimum, these facts establish that Howard and Davidi were actively involved in each other's lives and maintained a familial relationship as of 2015. Sufficient evidence has been produced to create a genuine issue of material fact as to whether Davidi was acting independently under *Cornerstone*.

Next, I consider whether Davidi actively furthered the interests of Howard, the interested party. Here, the Plaintiffs' new theories of fact regarding Davidi's breach of fiduciary duty become relevant. I find the evidence supporting such a breach relatively weak, but sufficient under the Plaintiff-friendly standard to withstand the Jonas Summary Judgment Motion.

The first allegation is that Davidi "tipped" Howard as to the Special Committee's plan to place the Indemnification Claim into a litigation trust. The evidence supporting this claim is so thin as to be sheer. It is undisputed that Howard learned of the Special Committee's plan to preserve the Indemnification Claim on

---

[187] Richardson Decl., Ex. 50, at 471–73.
[188] *Id.* at Ex. 66; *see also id.* at Ex. 67 (email gifting Davidi $700,000 "from [Howard's] accounts").

39

March 14, *the same day a bid letter was sent to prospective buyers indicating the claim would not be sold.*[189] The evidence put forth in support of Plaintiffs' claim is this: the timing of Howard's reaction to the Indemnification Claim, and the fact that the Special Committee's counsel at Shearman testified "someone" must have informed Howard of the Special Committee's plan.[190] Davidi, along with representatives from external advisors, testified that he did not warn Howard of the Special Committee's plan.[191] But the evidence shows that the plan to retain the Indemnification Claim had been circulated to multiple third parties. The universe of "someones" who could have shared the plan with Howard expanded dramatically as of March 14. Without evidence specifically linked to Davidi, the Plaintiffs' claim does not rise above the level of mere allegations or speculation and is an insufficient factual basis, standing alone, to allow a breach of fiduciary duty claim to survive.

Similarly, the contention that Davidi caused Cyrulnik to intervene on Howard's behalf, standing alone, is unconvincing. There is evidence supporting the Plaintiffs' claim, as shown in the text messages produced between Davidi and Cyrulnik late in the evening on March 28. The texts, which simply ask "[Cyrulnik:] Hey – up? [Davidi:] Yes,"[192] are certainly circumstantial, but in the context of the

---

[189] *See supra* note 78 and accompanying text.
[190] Pls. MSJ AB 83–84.
[191] *See id.* at 84.
[192] Richardson Decl., Ex. 53, at STRP-DJONAS0000981.

40

greater text message production, give rise to a possibility that Cyrulnik and Davidi spoke later that evening.[193] Cyrulnik and Davidi had, if not a history of telephone calls, at least a history of text messages strongly suggesting the occurrence of telephone calls.[194] The communication was pertinent given Cyrulnik's allegedly conflicted role in the transaction.[195] Further, the timing is paramount, as the meeting with the Special Committee was scheduled for about ten hours later.[196] This evidence is, at best, corroborative of allegations that Davidi acted disloyally. However, these arguments form only part of the Plaintiffs' theory supporting the claim of breach of fiduciary duty.

The Plaintiffs allege that Davidi provided notice to IDT of a potential third-party indemnification obligation for the pre-Spin-Off spectrum issues, and yet intentionally failed to inform the Special Committee or its counsel of this notice.[197] The alleged notice took the form of an email sent from Davidi to IDT on February 26, 2016, which reads in part: "According to a clause in the separation agreement . . .

---

[193] These messages were produced following the depositions of both Davidi and Cyrulnik, so neither has testified as to whether a call took place. *See* Jonas MSJ RB 24 n.23; *see also* Pls. MSJ AB 77. The Plaintiffs suggest this in their answering brief, and Davidi's reply brief does not outright deny that a call took place. *See* Pls. MSJ AB 78; Jonas MSJ RB 26 n.25 ("Plaintiffs point also to texts suggesting Davidi and Cyrulnik spoke by phone the evening of March 28 . . . . But there is zero evidence that anything material or harmful to the negotiations, or otherwise improper, was discussed on any call—only Plaintiffs' speculation.").

[194] *See supra* note 91 and accompanying text.

[195] *See, e.g.*, *supra* notes 41–42 and accompanying text.

[196] Pls. MSJ AB 78, 78 n.213 (identifying the pertinent time zone for the produced texts and the time change between the time zone and Eastern Daylight Time).

[197] *Id.* at 74.

IDT indemnifies [Straight Path] for activities prior to separation. Given the posture of the claims against [Straight Path] to date that clause may be implicated. We hope such indemnification won't be necessary."[198] At the March 29, 2017 meeting between Howard and the Special Committee, Cyrulnik (ostensibly acting as IDT's counsel) indicated that notice under the S&DA had *not* been given with respect to the Consent Decree, and therefore the Indemnification Claim might not be viable.[199] The theory suggests that, as the Special Committee was not aware of Davidi's February 2016 email (of which he had intentionally not informed them), they may have believed that notice had not been provided and thus considered the claim somewhat less valuable than it in fact was. In this way, Davidi's failure to inform the Special Committee of the email furthered his father's interests.

I state the above to outline the theory, which was not entirely clear from the papers. In so doing, I do not presuppose that the theory is correct. Evidence has been aggregated that could support the breach of fiduciary duty claim. This theory revolves around Davidi's credibility, which is appropriately assessed at trial.

The same is true of the Plaintiffs' final remaining argument. Davidi was not a member of the Special Committee, but the parties generally agree that he encouraged the parties to reach a settlement. They disagree upon the

---

[198] Richardson Decl., Ex. 12.
[199] *Id.* at Ex. 41, at 525:10–16.

characterization. Particularly, the Plaintiffs claim that Davidi "undermine[d]" the negotiations about the Indemnification Claim and "cooperated" with Howard, Shmuel, and Cyrulnik to pressure the Special Committee into accepting Howard's settlement.[200] In favor of the undermining argument, they point to deposition testimony by one of the directors on the Special Committee, who indicated that Davidi was "kind of leaning on the three of us independent directors, even wrote us a memo saying, how can you be taking this position, this is against your duty as directors of Straight Path."[201] Further evidence, at least in the Plaintiffs' view, includes deposition testimony from Shmuel Jonas, Davidi's brother and the CEO of IDT at the pertinent time, indicating that he and Davidi spoke "[a] couple days before" the March 29 meeting, and that Davidi "just kept pressuring me over and over to settle the claim, settle the claim."[202] In response, Davidi indicates that he "acted properly to facilitate a sale of [Straight Path], which all parties concede was in the best interests of" Straight Path and its stockholders.[203] Straight Path's outside advisors at Evercore even encouraged Davidi to reach out to Howard to ask him to attend a settlement meeting.[204]

---

[200] Pls. MSJ AB 74, 82.
[201] Richardson Decl., Ex. 2, at 447:20–448:5.
[202] *Id.* at Ex. 51, at 202:6–203:21.
[203] Jonas MSJ OB 22.
[204] Dep. Comp., Ex. 9, 256:8–17.

The Plaintiffs' theory here is that Davidi was breaching his fiduciary duties by participating in unsanctioned negotiations in a disloyal attempt to encourage an inadequate settlement of the Indemnification Claim. An opposite interpretation is also reasonable and cannot be precluded as a matter of law. This is again an issue of credibility best suited to resolution after trial. Accordingly, summary judgment is denied.

Finally, Davidi seeks summary judgment on the issue of joint and several liability.[205] It would be premature to address this question at this time, so I do not consider it here.

* * *

In total, the Davidi Jonas Summary Judgment Motion is denied. Although the evidence on some of the Plaintiffs' contentions is only marginal, it is sufficient to survive the current motion, as credibility questions remain regarding Davidi's actions in connection with the Indemnification Claim that must be resolved upon a fuller record.

---

[205] Jonas MSJ RB 30–32.

44

## III. CONCLUSION

The IDT Defendants' motion for summary judgment is DENIED. Davidi Jonas's motion for summary judgment is DENIED. The parties should submit an appropriate form of order.